RENDERED:  APRIL 27, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0038-MR

DAVID A. KIMMEL                                                 APPELLANT

                  ON APPEAL FROM BOYD CIRCUIT COURT
V.                HONORABLE JOHN F. VINCENT, JUDGE
                         NO. 20-CR-00134

COMMONWEALTH OF KENTUCKY                          APPELLEE

AND

2022-SC-0061-MR

DAVID A. KIMMEL                                                 APPELLANT

                  ON APPEAL FROM BOYD CIRCUIT COURT
V.                HONORABLE JOHN F. VINCENT, JUDGE
                         NO. 21-CR-00141

COMMONWEALTH OF KENTUCKY                          APPELLEE

**OPINION OF THE COURT BY JUSTICE BISIG**

**AFFIRMING IN PART, VACATING IN PART, AND REMANDING**

In March 2020, Appellant David A. Kimmel shoplifted from Walmart in Boyd County, Kentucky.  He was charged and subsequently released on bond pending trial.  Six months later, Kimmel shoplifted from Rural King.  Prior to these 2020 shoplifting incidents, each store gave Kimmel notice prohibiting

him from being on the premises. Kimmel agreed to have all charges tried at once and, after a jury trial, the trial court sentenced Kimmel to forty years in prison consistent with the jury's recommendation. Kimmel now appeals as a matter of right. After review, we conclude that the forty-year sentence violates the aggregate cap on sentences prescribed by Kentucky Revised Statute (KRS) 532.110(1)(c). For the following reasons, we affirm in part, vacate in part, and remand this case to the Boyd Circuit Court.

## FACTS AND PROCEDURAL HISTORY

On March 12, 2020, Michael Knipp, an Asset Protection associate at Walmart in Boyd County, Kentucky observed Kimmel entering the store. Knipp was familiar with Kimmel because Kimmel had previously been caught shoplifting at Walmart. Because of this familiarity, Knipp called the sheriff's department almost immediately after observing Kimmel in the store. Knipp watched Kimmel picking up two dolls, two sports bras, and a phone charger. He concealed the sports bras on his person and placed the other items in his cart. He then walked to the hardware department and placed the sports bras, one doll, and the phone charger inside a mailbox box.[1] Kimmel resealed the box, walked to housewares, and concealed the other doll on his person. Kimmel proceeded to walk out the door without paying for the doll.

---

[1] In the Commonwealth's proffered trial testimony, Kimmel's actions were referred to as "box stuffing" where someone puts items inside a box and scans only the box to avoid paying for the items stuffed inside. On occasion, the box is left for an accomplice to purchase.

After Kimmel returned to a vehicle, a sheriff's deputy conducted a traffic stop on the van Kimmel was in. The doll was found inside the van and Kimmel could not produce a receipt for the merchandise. Inside the store, the mailbox box was photographed, showing it contained the doll, sports bras, and phone charger. Kimmel was ultimately charged with third-degree burglary given the prior notice to stay off the premises and theft by unlawful taking for shoplifting the doll.

After being charged for the Walmart incident on March 19, 2020 and subsequently released on bond, Kimmel committed another theft at the Rural King in Boyd County, Kentucky. On September 23, 2020, Jacob Thomas, a Rural King tractor manager, was walking into the store when he observed Kimmel pushing a shopping cart out of the store. Thomas was familiar with Kimmel because Kimmel stole from Rural King before and was previously given notice to stay off the premises.

The shopping cart contained three boxes of ammunition. Thomas repeatedly asked Kimmel for a receipt, which he did not produce. Kimmel then lied and stated he was trying to return the ammunition. Thomas grabbed the cart and Kimmel picked up two of the boxes of ammunition from the cart. Kimmel then ran to his vehicle and left the premises. Thomas reported the theft and gave a statement to police. Kentucky State Police investigated the theft and later located Kimmel. On April 13, 2021, Kimmel was charged with third-degree burglary given the prior notice to stay off the premises and theft

by unlawful taking for shoplifting the ammunition. He was also indicted for being a first-degree Persistent Felony Offender (PFO).

Kimmel agreed to have all charges tried together and trial began on November 22, 2021. Deanna Harris, Kimmel's girlfriend who accompanied him to Walmart, testified that an unknown individual had purchased the doll found in Kimmel's vehicle and that they planned to return it. Harris also accompanied Kimmel to Rural King on September 23, 2020. Harris claimed she was the one pushing the shopping cart with the ammunition out of the store, and she was the one approached by Thomas. Harris also stated that Kimmel had no intention of stealing anything that day, and that Kimmel was unaware that she had taken the boxes of ammunition. Harris pled guilty to theft by unlawful taking for the two boxes of ammunition stolen from Rural King.

Kimmel also testified and stated that two days prior to the Walmart incident, his mother purchased the doll found in his vehicle. He also stated that no Walmart staff approached him and told him to leave Walmart property. As to the Rural King incident, Kimmel advised that he entered the store with Harris. Kimmel testified that after a brief verbal argument, he left the store before Harris and Harris was the one who stole the ammunition. Kimmel did not recall being approached by Thomas but remembered that a store employee approached him while putting the ammunition in his car. On cross-examination, Kimmel admitted that he knew he was not permitted on Walmart or Rural King property.

4

The jury found Kimmel guilty of two counts of third-degree burglary, two counts of theft by unlawful taking (under $500) and being a first-degree PFO. The jury initially recommended a sentence of five years on each burglary charge but enhanced those sentences to twenty years each after finding that Kimmel is a first-degree PFO. The jury also recommended that the sentences run consecutively, for a total sentence of forty years. The trial court followed the jury's recommendation. Kimmel appeals as a matter of right.

**ANALYSIS**

### I. The trial court erred when it ordered Kimmel to serve a forty-year sentence.

In accordance with the jury's recommendation, the trial court sentenced Kimmel to five years for each burglary count, enhanced each count to twenty years based upon his PFO status, and then ran the sentences consecutively for a total sentence of forty years. Kimmel argues that the trial court erred by ordering him to serve a forty-year sentence. KRS 532.110(1)(c) states, in relevant part, that "[t]he aggregate of consecutive indeterminate terms shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 for the highest class of crime for which any of the sentences is imposed." Third-degree burglary is a Class D felony. Because the maximum length authorized by KRS 532.080 for a Class D felony as enhanced by a PFO determination is twenty years, Kimmel argues that the trial court erred by entering an aggregate consecutive sentence doubling that amount.

During sentencing, defense counsel argued that the maximum term of imprisonment for Class D felonies enhanced by the PFO statute is twenty

5

years. Therefore, pursuant to KRS 532.110(1)(c), defense counsel requested that the trial court correct the illegal forty-year sentence recommended by the jury. The trial court inquired with the Commonwealth, and counsel for the Commonwealth advised the trial court that the Department of Corrections would automatically fix the error. The trial court agreed, classifying it as a computation issue, not a sentencing issue. The trial court followed the jury's recommendation and ran the two twenty-year sentences consecutively for a total sentence of forty years and entered the final judgment.

In *McClanahan v. Commonwealth,* 308 S.W.3d 694, 699 (Ky. 2010), the Court explained that for a PFO convicted of a Class C felony, the aggregate of the sentences imposed could not lawfully exceed twenty years. KRS 532.080 provides the same sentence limitation for Class D felonies. However, albeit in a footnote, the Court also noted that "[t]here are several statutory exceptions to this general rule," including KRS 533.060(3). *McClanahan,* 308 S.W.3d at 699 n.8.

KRS 533.060(3) states:

[w]hen a person commits an offense while awaiting trial for another offense, and is subsequently convicted or enters a plea of guilty to the offense committed while awaiting trial, the sentence imposed for the offense committed while awaiting trial shall not run concurrently with confinement for the offense for which the person is awaiting trial.

This issue requires analysis of the interplay between KRS 532.110, KRS 532.080 (the first-degree PFO statute), and KRS 533.060.

The Commonwealth argues that KRS 533.060(3) controls and, as such, the trial court did not err in sentencing Kimmel to forty years in prison. When

6

a person commits an offense while awaiting trial for a prior offense, KRS 533.060(3) prohibits the imposition of a sentence for the offense committed while awaiting trial that runs concurrently with confinement for the offense for which the person was awaiting trial. The practical effect is that the trial court must run the sentence for the offense committed while awaiting trial consecutively with the confinement for the offense for which the person was awaiting trial. Here, applying KRS 533.060(3) in isolation would lead to a conclusion that the trial court correctly imposed a forty-year sentence.

However, we must also apply KRS 532.110(1)(c), which imposes a maximum aggregate sentence of the longest extended term authorized by KRS 532.080. Based on the offenses for which Kimmel was convicted, the maximum term of imprisonment is twenty years, in accordance with KRS 532.080(6)(b). Notably, KRS 532.110(1)(c) states:

> The aggregate of **consecutive indeterminate terms** shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 for the highest class of crime for which any of the sentences is imposed.

(Emphasis added.) This subsection specifically references consecutive terms. Therefore, KRS 533.060(3) and KRS 532.110(1)(c) can both be applied to Kimmel's sentence.

*Devore v. Commonwealth,* 662 S.W.2d 829 (Ky. 1984), required analysis of both KRS 533.060(2) and KRS 532.110(1)(c). KRS 533.060(2) states that when a person has been convicted of a felony and is released on parole or probation and is then convicted of or enters a guilty plea to a felony committed while on parole or probation, the period of confinement for that felony "shall

7

not run concurrently with any other sentence." The *Devore* Court concluded that the maximum sentence rule in KRS 532.110(1)(c) is not applicable to individuals that fall within KRS 533.060(2). *Id.* at 831. In that multi-count case, the trial court imposed a seventy-five-year sentence for burglary, felony theft, receiving stolen property, trespass, and being a PFO. *Id.* At 829. The *Devore* Court upheld the trial court's decision to run that seventy-five-year sentence consecutively to a prior five-year sentence for a total sentence of eighty years.

Later, in *Peyton v. Commonwealth,* 253 S.W.3d 504 (Ky. 2008), the Court overruled *Devore* to the extent that it "require[d] all subsequent sentences for crimes committed while on probation or parole to be run consecutively to each other." *Id.* at 511. The Court concluded that the

> subsequent felony offense(s) committed while on probation or parole may not be run concurrently with the sentence for which the individual is on probation or parole. In the instance of multiple-count subsequent felony offenses committed while on probation or parole, however, these subsequent offenses may be run either consecutively or concurrently, at the court's discretion.

*Id.* The *Peyton* Court was not tasked with considering the interplay between KRS 533.060(2) and KRS 532.110(1)(c) because the sentence of imprisonment in *Peyton* did not exceed the maximum permissible under the statute. *Id.* at 510. Although the *Peyton* Court recognized the legislature's intent in enacting KRS 533.060(2) "was to strengthen the ramifications for repeat offenders," the Court believed that *Devore* could lead to "incongruous and excessive sentencing results" and "sought to interpret this legislative intent with a much heavier

8

hand than the statute, the legislature or the jails and prisons of this Commonwealth could have ever envisioned." *Id.* at 509-10.

In *Blackburn v. Commonwealth,* 394 S.W.3d 395, 396 (Ky. 2011), the defendant was charged in two separate indictments, and each indictment charged Blackburn with one count of first-degree trafficking in a controlled substance, a Class C felony. At the time she committed these trafficking offenses, Blackburn was out of prison on parole. *Id.* The jury initially recommended ten-year sentences for each conviction, and that the sentences run consecutively. *Id.* Thereafter, the jury also found Blackburn guilty of being a second-degree PFO and recommended a twenty-year sentence for each conviction. *Id.* The trial court ordered that the sentences run consecutively for a total sentence of forty years in prison. *Id.*

On appeal, Blackburn argued that the forty-year sentence violated the statutory maximum provided by KRS 532.110(1)(c). *Id.* at 398. In response, the Commonwealth cited KRS 533.060(2), which states that if a person is convicted of a felony and released on probation or parole and is then convicted of a felony committed while on probation or parole, the person shall not be eligible for probation or parole "**and the period of confinement for that felony shall not run concurrently with any other sentence.**" *Id.* (Emphasis added.) As such, the Commonwealth asserted that the trial court did not err in sentencing Blackburn in excess of the aggregate cap. *Id.*

After considering *Devore* and *Peyton,* the *Blackburn* Court concluded that KRS 533.060(2) does not modify the maximum aggregate sentence allowed by

9

KRS 532.110(1). *Blackburn,* 394 S.W.3d at 401. Therefore, the trial court incorrectly sentenced Blackburn to forty years in prison. *Id.* Because the maximum sentence authorized by KRS 532.080 for an enhanced Class D felony is twenty years, the Court concluded that "the aggregate of [Blackburn's] consecutive sentences (for the multiple subsequent offenses) could not exceed that amount." *Id.* "To the extent *Devore* states otherwise, it is overruled." *Id.*

To summarize, in *Devore,* 662 S.W.2d at 531, the Court concluded that multiple-count felony convictions resulting from offenses committed while on parole must run consecutively to one another. In *Peyton,* 253 S.W.3d at 510-11, the Court overruled that *Devore* holding and reasoned that it "leads to an unworkable interpretation of KRS 533.060(2)." But the *Peyton* Court did not address the effect of KRS 532.110(1)(c) on the trial court's sentencing discretion because the punishment in *Peyton* did not exceed the maximum aggregate cap outlined in KRS 532.110(1)(c). Later, in *Blackburn,* 394 S.W.3d at 401, the Court concluded that "KRS 533.060(2) does not modify KRS 532.110(1) so that subsequent offenses run consecutively may exceed the maximum aggregate duration allowed by KRS 532.110(1)(c)." *Blackburn* overruled *Devore* to the extent it states otherwise. *Id.*

The specific holding of *Blackburn* applies to KRS 533.060(2), and does not explicitly address KRS 533.060(3), which is the subsection raised by the Commonwealth in its argument. However, the reasoning espoused in *Blackburn* is equally applicable here. Treating subsequent crimes under KRS 533.060(2) and (3) differently would lead to illogical and inconsistent results.

10

In an unpublished opinion by this Court, *Holbrook v. Commonwealth,* 2012-SC-0703 and 2012-SC-0704, 2014 WL 4160137, *1 (Ky. Aug. 21, 2014), Holbrook appealed from two final judgments entered by the Fayette Circuit Court following two separate trials on theft by deception charges pertaining to cold checks. While released on bond pending a trial in the first case, Holbrook committed other offenses which led to the second trial. *Id.* Holbrook was sentenced to a total of sixty years in prison—twenty years from the first case and forty years from the second, both of which resulted from PFO enhancements. *Id.* In the second case, the trial court sentenced Holbrook to ten years for each theft by deception over $10,000 count, enhanced each count to twenty years based on his PFO status, and ran the sentences consecutively for a total of forty years. *Id.* at *15. The appeals from each trial were consolidated, and Holbrook argued, among other things, that his consecutive forty-year sentence from the second trial violated the maximum aggregate sentence allowed under KRS 532.110(1)(c), which was twenty years. *Id.* at *16. The Commonwealth conceded the error, citing *Blackburn,* 394 S.W.3d at 397-402. *Id.*

This Court followed *Blackburn* and concluded that the trial court incorrectly entered a total sentence of forty years based upon the jury's recommendation that Holbrook's sentences should run consecutively. *Id.* With little elaboration, the Court vacated Holbrook's forty-year sentence and remanded the case to the trial court for resentencing by the court, not the jury. *Id.* While *Holbrook* did not implicate KRS 533.060, the Court cited *Blackburn*

11

for its holding that the "statutory maximums established by the interplay of KRS 532.080 and KRS 532.110(1)(c) control over the jury's discretion in recommending consecutive sentences." *Id.*

We note the existence of two opinions rendered over twenty years ago, *Moore v. Commonwealth,* 990 S.W.2d 618, 619 (Ky. 1999), and *White v. Commonwealth,* 5 S.W.3d 140, 142 (Ky. 1999), in which the appellants committed subsequent offenses while released on bond and awaiting trial. This Court cited the legislature's intent to punish persons convicted of committing subsequent crimes while awaiting trial more severely by eliminating the possibility of concurrent sentences. *Moore,* 990 S.W.2d 618, did not implicate KRS 532.110(1)(c). In *White,* 5 S.W.3d at 142, the appellant argued that the trial court erred by not running the twenty-year sentence imposed for the offenses committed while on bond concurrently with a one-year sentence he was already serving. The *White* Court relied on *Devore* and concluded that KRS 533.060(3) controls over KRS 532.110(1)(c). *Id.* Nevertheless, we find that the more recent rationale behind applying KRS 533.060, subject to the statutory limits contained in KRS 532.110(1), as explained in *Blackburn* controls.

We also recognize that a 2002 amendment to KRS 532.110 supports our conclusions. In 2002, the General Assembly amended KRS 532.110(2) to indicate that where a judgment is silent as to whether multiple sentences run concurrently or consecutively, the sentences run concurrently "unless the sentence is required by . . . KRS 533.060 to run consecutively." Thus, the General Assembly amended the maximum sentence statute in full

12

recognition—and indeed with specific acknowledgement—that KRS 533.060 mandates that certain sentences be run consecutively.

In amending KRS 532.110, the General Assembly could have indicated that such consecutively running sentences may be imposed even where they exceed the maximum aggregate sentence requirement in KRS 532.110(1)(c). The General Assembly did not do so, and we will not write into the statute what the General Assembly has not said. This is particularly so given our previous ruling in *Blackburn* and our inability to perceive any logical basis to treat offenses committed while awaiting trial differently—and more harshly—than those committed by persons violating the privilege of probation.

We further recognize our obligation to harmonize apparently conflicting statutes when it is possible to do so. Indeed, we have often noted that "'[w]here there is an apparent conflict between statutes or sections thereof, **it is the duty of the court to try to harmonize the interpretation of the law so as to give effect to both sections or statutes if possible.**'" *Elliott v. Lanham*, 540 S.W.3d 353, 356 n.11 (Ky. 2018) (quoting *Ledford v. Faulkner*, 661 S.W.2d 475, 476 (Ky. 1983)) (emphasis added). Here, the statutes conflict insofar as KRS 533.060 requires consecutive sentences for a total term that violates the maximum aggregate sentence cap set forth in KRS 532.110. Applying KRS 533.060 alone, Kimmel should be sentenced to forty years. However, we must strive to give effect to *both* KRS 533.060 *and* KRS 532.110. To harmonize and give effect to both statutes, we conclude that while sentences under KRS

13

533.060(3) must be consecutive, the resulting total term of years cannot violate the maximum aggregate sentence cap set forth in KRS 532.110(1)(c).

The dissent insists that our precedent interpreting KRS 533.060(2) is inapplicable here, focusing on the portion of that subsection that states "the period of confinement for that felony shall not run concurrently *with any other sentence."* The dissent aptly notes that KRS 533.060(3) does not contain the "any other sentence" language but fails to recognize that inclusion of such language in subsection three would be illogical. In subsection two, a person has already been convicted of a felony and released on probation or parole. In subsection three, a person is "awaiting trial for another offense" and thus there is presumably no "other sentence" for a trial court's consideration during sentencing.

We recognize that KRS 533.060(3) is straightforward. But when construing statutes, we must give "words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Cosby v. Commonwealth,* 147 S.W.3d 56, 59 (Ky. 2004) (quotation omitted). In applying subsections two and three differently, as the dissent suggests, we would have to assume that the legislature intended to be more lenient in sentencing persons that have already been found guilty of felony offenses and who commit subsequent offenses while on probation or parole. For subsection two to apply, these persons must have violated the "very special privilege" of probation or parole. *Devore,* 662 S.W.2d at 831. Conversely, we would also need to assume that the legislature intended to punish persons who commit

14

*any* offense (not just felony offenses) while awaiting trial for *any offense* more harshly than persons convicted of felony offenses who are probated or paroled only to commit another felony offense. That simply cannot be the legislative intent behind KRS 533.060.

Kimmel also argues that this case does not involve subsequent convictions, as stated in KRS 533.060(3), because he was convicted simultaneously of both offenses. However, in assessing the plain language of the statute, we interpret it to mean that a person must commit a crime while awaiting trial and their conviction or plea must be **subsequent to the crime committed while awaiting trial** – not that they must be subsequently convicted of committing a crime while awaiting trial after they have been convicted of the original crime.

The trial court erred by imposing a forty-year sentence that exceeded the maximum aggregate cap delineated in KRS 532.110(1)(c). As such we vacate Kimmel's forty-year sentence and remand to resentence Kimmel to twenty years in prison.

### II. The trial court did not err when it permitted introduction of evidence of prior instances of shoplifting.

Kimmel argues that the trial court erred in allowing admission of irrelevant and prejudicial evidence of two prior allegations of shoplifting. Specifically, Kimmel asserts that the evidence of him placing items in a mailbox at Walmart and stealing a lawnmower from Rural King was improperly admitted. On November 12, 2021, the Commonwealth gave notice under Kentucky Rule of Evidence (KRE) 404(c) of its intent to introduce evidence of

15

seven prior instances of shoplifting at Walmart and one prior instance of shoplifting at Rural King. The Commonwealth indicated that the evidence would be offered to prove motive, intent, preparation, plan, knowledge, and absence of mistake or accident. While not mentioned in the body of the motion, there was in incident involving a mailbox referenced in one of the exhibits.

That exhibit was an internal document prepared by Asset Protection Associate Michael Knipp for Walmart. Knipp observed Kimmel selecting two sports bras and two dolls from the shelf, then concealing the bras in his pants. Kimmel left the clothing area and went to the hardware section, where he selected a mailbox and concealed one doll, a phone charger, and the two sports bras he had hidden in his pants inside the mailbox. Kimmel resealed the mailbox packaging and left the area. Knipp clarified that while he observed Kimmel concealing items on his person, an Asset Protection trainee observed the actual box stuffing.

At trial, Knipp testified to those basic facts but clarified that he had not personally observed Kimmel put items in the mailbox. A trainee observed Kimmel and relayed the events to Knipp. Knipp explained that this type of action is called box stuffing. After an individual fills the mailbox packaging with extra items, they will only pay for the mailbox. The individual then may try to return or exchange the items at Walmart, even though they did not pay for them. In this case, the total value of the items in the mailbox was $62.72. Deputy Mark Wheeler also testified about his familiarity with the practice of

16

box stuffing, classifying this form of theft as either an individual act or an act done in concert with another individual.

The Commonwealth also introduced evidence of Kimmel stealing a lawnmower from Rural King. Former Rural King tractor manager Jacob Thomas testified that in February 2020, Kimmel stole a lawnmower from Rural King. Thomas stated that Kimmel pulled a lawnmower from an outside display and brought it inside the store. Kimmel exited the store. Thomas walked in the store and asked other employees if anyone sold a lawnmower, and no one had made such a sale. By the time Thomas walked back outside, he saw Kimmel load the lawnmower into his vehicle before Thomas could ask him to produce a receipt. After the incident, Thomas saw Kimmel sign a notice restricting him from Rural King property. Former State Trooper Daniel Vossmer also testified that when they located the stolen lawnmower, Kimmel was "trespassed" from Rural King by the Boyd County Sheriff's Department.[2]

Kimmel acknowledges that this KRE 404(b) issue is unpreserved for appellate review and requests palpable error review. "A palpable error which affects the substantial rights of a party may be considered. . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Rule of Criminal Procedure (RCr) 10.26. An error is palpable when it is "'easily perceptible, plain, obvious and readily

---

[2] The term "trespassed from" was used throughout trial. The Commonwealth explains that this phrase means Kimmel was given notice to remain off the properties.

noticeable.'" *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The error must be "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). "A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings." *Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) Given the strength of the substantial evidence against Kimmel, the admission of the KRE 404(b) evidence did not seriously affect the fairness of the trial.

KRE 404(b) provides that, generally, evidence of other crimes or wrongs is not admissible to prove the character of a person in order to show conformity therewith. However, such evidence may be admissible:

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 404(b). To determine whether evidence of other bad acts is admissible under KRE 404(b), the Court must consider relevance, probative value, and prejudice. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). Given the similarity of the conduct at issue, we address the prior Walmart and Rural King incidents together.

First, the evidence of box stuffing and the lawnmower incident was relevant under KRE 401. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

18

without the evidence." KRE 401. Evidence of prior incidents at both stores are undoubtedly relevant to the burglary and theft charges. The fact that Kimmel engaged in similar conduct at both locations on prior occasions has a tendency to make it more probable that, on the day in question, he was present at both stores with the intent to commit a crime and that he shoplifted. The employees of both Walmart and Rural King indicated as much in their testimony – they identified Kimmel at their stores on the dates in question and recognized him from past incidents of shoplifting. As such, the evidence was relevant.

Next, we consider whether the evidence was probative. "[E]vidence of other bad acts is sufficiently probative if 'the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Howard v. Commonwealth,* 595 S.W.3d 462, 476 (Ky. 2020)(quoting *Parker v. Commonwealth,* 952 S.W.2d 209, 217 (Ky. 1997)). Here, Knipp provided testimony indicating that he observed Kimmel conceal items on his person. The same items concealed on his person were soon after stuffed in the mailbox. Those items were later photographed inside the mailbox and the photograph was introduced at trial as evidence of the box stuffing. As to the Rural King incident, Thomas testified that he approached Kimmel on the day he stole ammunition because he recognized Kimmel from the lawnmower incident and knew he was not supposed to be on store property. Based on this testimony and evidence, "the jury could reasonably infer that the prior bad acts occurred." *Id.*

19

Kimmel also highlights what he perceives as uncertainty as to whether Knipp personally observed the acts in question. Kimmel asserts that it was an asset protection trainee that observed him stuffing the mailbox, not Knipp, so there is no competent evidence of the box stuffing incident. Kimmel also states it is unclear whether Knipp actually saw any of Kimmel's actions. We agree that what actions Knipp personally observed is unclear. At the beginning of Knipp's testimony, he states that he and the trainee were walking the sales floor at Walmart on the day in question. Knipp observed Kimmel and informed the trainee about Kimmel's history at the store. Knipp then stated, "we continued watching him," during which time they observed Kimmel carrying the two sports bras, a phone charger and two dolls. Kimmel then concealed the items on his person. Knipp further described the box stuffing incident. Then, the Commonwealth asked Knipp if he "personally had eyes" on Kimmel when he was in the store that day, to which Knipp responded "yes."

On cross-examination, Knipp stated he did not recall seeing Kimmel conceal the items in the mailbox, and that it might have been the trainee that observed that portion of the incident. He also admitted that the surveillance video did not show the box stuffing. It is unclear which of Kimmel's actions that Knipp personally observed, and which of Kimmel's actions the trainee observed. In any event, the Commonwealth introduced photo evidence of the mailbox that showed the items in question inside. Given Knipp's general observations of Kimmel and the items he was carrying then concealed, this

20

evidence is sufficiently probative because it allowed the jury to reasonably infer that the box stuffing incident occurred.

Further, evidence of the lawnmower incident was necessary to prove the elements of third-degree burglary. The Commonwealth had to prove Kimmel's knowledge that he was not allowed to be on Rural King property. The prior theft incident with the lawnmower served as proof that Kimmel was not permitted on the property. Thomas also testified that on the day at issue, he recognized Kimmel and knew he was not supposed to be on the property because of the lawnmower incident. This knowledge prompted Thomas to approach Kimmel to ask for a receipt for the ammunition.

Finally, a trial court must weigh the prejudicial nature of the evidence against its probative value. *Bell,* 875 S.W.2d at 889. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ." KRE 403. "A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014) (citing *Barnett v. Commonwealth,* 979 S.W.2d 98, 100 (Ky.1998)).

The evidence of Kimmel previously stealing a lawnmower and engaging in box stuffing was undoubtedly prejudicial. But we must determine whether that prejudice was "unnecessary and unreasonable." *Price v. Commonwealth,* 31 S.W.3d 885, 888 (Ky. 2000). At trial, the Commonwealth produced a

21

significant amount of evidence demonstrating that Kimmel committed the crimes for which he was charged. Both testimony and documentation indicated that Kimmel was not allowed on the premises and that he intended to commit crimes. Ultimately, the evidence of other acts demonstrated motive, intent, knowledge, and plan. KRE 404(b)(1). Admission of the evidence did not constitute manifest injustice.

Kimmel argues that the Commonwealth only needed to prove that Kimmel knowingly entered Walmart and Rural King with the understanding that he could not be on the property and that he intended to commit a crime while on the property. Importantly, the Commonwealth was tasked with proving Kimmel was unlawfully at Walmart and Rural King with an intent to steal. KRS 511.040(1). The mailbox stuffing and lawnmower evidence directly contradicted Kimmel's trial testimony that he did not intend to steal anything from either location. Further, "evidence of similar acts perpetrated against the same victim are almost always admissible . . . ." *Harp v. Commonwealth*, 266 S.W.3d 813, 822 (Ky. 2008). This evidence serves "to prove the defendant's intent, plan, or absence of mistake or accident." *Dant v. Commonwealth*, 258 S.W.3d 12, 19 (Ky. 2008) (internal quotations and citations omitted).

While *Harp* and *Dant* involved instances of physical abuse, the same rationale can and should be applied here. Here, we have a similar act (shoplifting) being perpetrated against the same victims (Walmart and Rural King). On several occasions, Kimmel attempted to or successfully perpetrated offenses to the detriment of Walmart and Rural King. Additionally, we note

22

that the mailbox stuffing incident immediately proceeded Kimmel exiting

Walmart with the stolen doll down his pants. This incident occurred at the

same time, date, and place as the doll theft and during a continuous course of

conduct.

In this case, there was compelling evidence that Kimmel committed the

crimes in the indictment. The additional evidence of prior incidents at Walmart

and Rural King likely had little impact on the jury's determination of guilt,

particularly in light of the substantial evidence presented. There is no

substantial possibility that the result would have been different if this evidence

was not admitted. *Davis*, 620 S.W.3d at 30. As such, we cannot find that

admission of the KRE 404(b) evidence rose to the level of palpable error.

### III. The trial court did not err in permitting the Commonwealth to elicit narration from Michael Knipp during the Walmart video.

Finally, Kimmel argues that the trial court erred in allowing the

Commonwealth to elicit narration from Knipp while the Walmart video was

played at trial. This issue is unpreserved, and therefore reviewed under the

same palpable error standard outlined in Section II above.

During Knipp's testimony, the Commonwealth introduced surveillance

video purporting to show Kimmel 1) removing a doll from his car; 2) turning his

back to the surveillance camera; 3) raising his shirt; and 4) covering his

waistline up with his hoodie. Knipp testified briefly just before or after each

video clip, in part, as follows:

**Video 1:**

**Commonwealth**: What did we just observe?

23

**Knipp:** David Kimmel entering the facility.

**Video 2:**

**Commonwealth:** What did the video show?

**Knipp:** That was David Kimmel making a selection on the phone charger from the shelf.

**Video 3:**

**Commonwealth:** I guess before I click this, you had mentioned that there's not video in every single section of the store. Is that correct?

**Knipp:** Correct.

**Commonwealth:** And, is that why you walk the floor, to observe?

**Knipp:** Correct.

**Commonwealth:** Okay . . . . It appears this video is a little more grainy. You had testified earlier that Mr. Kimmel had gone down a particular aisle and concealed the remaining doll. Which aisle was that?

**Knipp:** It's going to be this aisle right here.

(resumes playing video)

**Commonwealth:** What did we observe there?

**Knipp:** David [Kimmel] remove the doll from the top of the buggy, turned his back to the camera, raised up his shirt, concealed the merchandise into his pants, covered his waistline back up with his hoodie.

**Video 4:**

**Commonwealth:** What did we observe there?

**Knipp:** David Kimmel exiting the facility.

Kimmel did not object to this testimony.

24

Knipp provided narrative testimony in conjunction with the surveillance videos. KRE 602 and KRE 701 govern the admissibility of narrative testimony. KRE 602 requires a witness to have personal knowledge before being permitted to testify about something. KRE 701 limits a lay witness's testimony to matters "a) rationally based on the perception of the witness; [and] b) helpful to a clear understanding of the witnesses' testimony or demonstration of a fact in issue." In *Boyd v. Commonwealth,* 439 S.W.3d 126, 131 (Ky. 2014), this Court explained that

> narration of a video may be proper but only if it is comprised of opinions and inferences that are rationally based on the witnesses' own perceptions of which he had personal knowledge and that are helpful to the jury. Furthermore, witnesses are limited to a description of events when narrating video footage and any interpretation of that footage is improper.

(Citing *Cuzick v. Commonwealth,* 276 S.W.3d 260, 265–66 (Ky.2009)).

In arguing that Knipp's narration was improper, Kimmel again classifies Knipp's testimony as inconsistent and uncertain, creating a question as to whether Knipp had personal knowledge of what was shown on the surveillance videos. *See* discussion *supra,* Section II. While Knipp's testimony as to what he personally observed and what the asset protection trainee observed lacked clarity, Knipp nonetheless possessed some degree of personal knowledge about Kimmel and his actions in the store that day based on his testimony that "we continued watching him" and that he personally had eyes on Kimmel. While Knipp did not observe everything Kimmel did that day, Knipp clearly followed Kimmel and observed him committing portions of the burglary at Walmart.

25

In videos 1, 2 and 4, Kimmel is shown entering Walmart, selecting a phone charger from the shelf, and exiting Walmart. Kimmel spends time in the relevant aisle and is shown with the phone charger in his hand. These actions are clearly depicted by the video, and Knipp's narration did not add to what jurors could view on the video themselves. Video 3 is of poor quality, and it is difficult to ascertain where Kimmel is located in the video or his actions.[3] Knipp testified that Kimmel removed the doll from the cart, turned his back, raised his shirt and concealed the merchandise in his pants. The difficulty in observing Kimmel in the video, paired with the uncertainty as to which of Kimmel's actions Knipp personally observed, leads us to conclude that Knipp's narration as to Video 3 exceeded the bounds of KRE 602 and 701. Because we cannot definitively conclude whether Knipp's testimony exceeded his personal knowledge of the events, this narration should not have been permitted.

Nevertheless, we cannot say this error was palpable. The jurors watched the video and "were in a position to interpret the security footage independently from the testimony." *Boyd*, 439 S.W.3d at 132. Additionally, the evidence against Kimmel was substantial, making it difficult to conclude that the jury was improperly persuaded by Knipp's one-line testimony describing Kimmel's actions. The error certainly was not palpable and so fundamental that it threatened the integrity of the judicial process. *Brewer*, 206 S.W.3d at 349; *Martin*, 207 S.W.3d at 5.

---

[3] The trial exhibits are not available in the record from the trial court. Therefore, we watched the surveillance videos through the trial footage, making video 3 even more difficult to interpret.

## **CONCLUSION**

For the foregoing reasons, we hereby affirm Kimmel's convictions. However, his forty-year sentence is vacated, and this case is remanded to the trial court for resentencing to reduce Kimmel's sentence to twenty years pursuant to KRS 532.110(1)(c).

All sitting. Lambert and Nickell, JJ., concur. Thompson, J., concurs by separate opinion. Conley, J., concurs in part and dissents in part by separate opinion in which VanMeter, C.J., and Keller, J., join.

THOMPSON, J., CONCURRING: I write separately to: (1) express my concern with the majority's decision to endorse the admission of Kentucky Rules of Evidence (KRE) 404(b) evidence at trial; (2) explain why I strongly concur that Kimmel should receive twenty-year concurrent sentences rather than consecutive sentences for a total of forty years of incarceration; and (3) express my frustration with the current state of sentencing laws in our Commonwealth and urge the General Assembly to carefully consider what its "tough on crime" stance is costing our state and its citizens by diverting our treasure to incarcerate low-level non-violent offenders to lengthy terms which are not proportional to their offenses.

### I. KRE 404(b) Evidence Should Not Have Been Admitted

I believe the Commonwealth, in proving that Kimmel committed the crimes of third-degree burglary, should only have been authorized to establish that Kimmel had been banned from patronizing the Walmart and Rural King

27

and not the reasons behind such bans. Pursuant to the Kentucky Rules of

Evidence 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> >
> > (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

While it was of course essential to prove that Kimmel had been banned from these stores to establish third-degree burglary, the basis for the bans was not offered for any appropriate purpose and was not so inextricably intertwined with the evidence of the bans as to require its admission. Kimmel's previous history of shoplifting was only relevant for the penalty phase of the trial.

However, given the overwhelming evidence that Kimmel committed the crimes at issue, which included video surveillance and eyewitness testimony, I believe the admission of this evidence in his trial was harmless. I caution, however, that this may not be true in other cases and that the Commonwealth should avoid introducing such improper character evidence in other cases.

**II. The Twenty-Year Sentence "Cap" Should Have Limited the Possible Sentence Imposed Over Other Statutes**

We are tasked with interpreting how three statutes should be interpreted together: KRS 532.110, KRS 532.080 and KRS 532.060. KRS 532.110(1) states:

> When multiple sentences of imprisonment are imposed on a defendant for more than one (1) crime, including a crime for which

28

a previous sentence of probation or conditional discharge has been revoked, the multiple sentences shall run concurrently or consecutively as the court shall determine at the time of sentence, except that: . . .

> (c) The aggregate of consecutive indeterminate terms shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 for the highest class of crime for which any of the sentences is imposed.

The "shall not exceed" language in KRS 532.110(1)(c) is of paramount importance.

KRS 532.080(6) provides:

A person who is found to be a persistent felony offender in the first degree shall be sentenced to imprisonment as follows: . . .

> (b) If the offense for which he presently stands convicted is a Class C or Class D felony, a persistent felony offender in the first degree shall be sentenced to an indeterminate term of imprisonment, the maximum of which shall not be less than ten (10) years nor more than twenty (20) years.

Therefore, the maximum length of the longest extended term authorized by KRS 532.080 for Class D felonies as a PFO-1 is twenty-years'. The "shall not exceed" language is a cap providing an absolute upper limit.

KRS 533.060(3) adds an additional wrinkle as follows:

When a person commits an offense while awaiting trial for another offense, and is subsequently convicted or enters a plea of guilty to the offense committed while awaiting trial, the sentence imposed for the offense committed while awaiting trial shall not run concurrently with confinement for the offense for which the person is awaiting trial.

"When all else is said and done, common sense must not be a stranger in the house of the law." *Cantrell v. Kentucky Unemployment Ins. Commission*, 450 S.W.2d 235, 237 (Ky. 1970). All things being equal, I will use common

29

sense in interpreting the overlapping laws that apply to determining Kimmel's maximum sentence. I will not interpret the language "shall not run concurrently" in KRS 533.060(3) to trump the stronger "shall not exceed" language of KRS 532.110(1)(c) because doing so does not make any logical sense.

By its terms, KRS 533.060(3) could have an effect if Kimmel had been sentenced to less than the maximum PFO-1 sentences for his crimes, but it cannot break through the "cap" provided by KRS 532.110(1)(c). Therefore, I strongly agree with the majority opinion that the maximum sentence Kimmel could receive was twenty years' total.

Capping Kimmel's sentence to a total of twenty-years' is as much as we can do in our role as Kentucky's highest court as we are tasked with interpreting the laws as they are written and have no authority to change them. I could end my concurring opinion here, but Kimmel's case has brought to the forefront my thoughts about Kentucky's problem with overincarceration in general, and especially our overincarceration of low-level offenders. Our Court should rule that a cap statute is a cap and encompasses or applies to all enhancement statutes enacted before or after the cap statute.

### III. Lengthy Sentences for Low Level Crimes Wastes our Limited Resources and is Counterproductive

Our incarcerated population has grown rapidly.

In the early 1970s, [Kentucky] had about 3000 convicted felons in custody, operated two prisons for men and a small prison for women, made no use of private prisons, had no inmates housed in county jails, and had a corrections budget of about 10 million dollars a year. By February of 2008, the state had 22,719 felons

under incarceration, owned and operated 13 full-sized state prisons (with very few if any empty beds), supervised the incarceration of about 1,600 inmates in three private prisons, had more than 8000 inmates serving their sentences in county jails across the state, and had a corrections budget of about 450 million dollars and rapidly bearing down on half-a-billion (not including the very heavy costs of prison construction).

Robert G. Lawson, *PFO Law Reform, A Crucial First Step Toward Sentencing Sanity in Kentucky*, 97 Ky. L.J. 1, 6–7 (2009) (*PFO Law Reform*) (internal citation footnotes omitted).

In 2011, Kentucky enacted sweeping reforms designed to curb the out-of-control growth in our prison populations through House Bill (HB) 463, the "Public Safety and Offender Accountability Act." These reforms included a mandatory reentry supervision policy, a reduction of classification for low level possession type drug charges, expanded access to evidence-based drug abuse treatment programs both in and out of correctional facilities, and the option for graduated sanctions to be used for minor probation violations. HB 463 has certainly done some good. "HB 463 has resulted in fewer inmates than would otherwise be the case, some savings to the state and better access to substance abuse treatment and programs that help reduce recidivism." Ashley Spalding, Corrections Data Shows Positive Impact of HB 463 that Additional Criminal Justice Reforms Can Build On (Sep. 28, 2016), https://kypolicy.org/new-data-shows-positive-impact-hb-463-additional-criminal-justice-reforms-can-build/. However, "[t]he impact of Kentucky's 2011 criminal justice reforms on the state's inmate population and budget have been much less than what was projected[.]" *Id.* "In fact, the state's inmate population is now higher [in 2016]

31

than it was in 2011, and the rate of inmates returning to prison after release —

"recidivism" — is on the rise." *Id.*

"Between 2011 and 2016 the number of people incarcerated in Kentucky

grew by 8%, resulting in Kentucky having the 10th highest incarceration rate

in the country." Carmen Mitchell, Pam Thomas, Ashley Spalding & Dustin

Pugul, *In Decade Since Major Criminal Justice Reform, the Kentucky General*

*Assembly Has Passed Six Times as Many Laws Increasing Incarceration as*

*Decreasing It*, Kentucky Center for Economic Policy 3 (Dec. 9, 2021),

https://kypolicy.org/wp-content/uploads/2021/12/Criminal-Penalties-

FINAL.pdf. (*Decade Since HB 463*).

The problem of overincarceration in Kentucky has only continued to

worsen since then. In 2018, Kentucky had the fifth highest rate of

incarceration nationwide. U.S. Department of Justice, Office of Justice

Programs, Bureau of Justice Statistics, 11-12 (Aug. 2020), https://bjs.ojp.

gov/content/pub/pdf/cpus1718.pdf. This adds up to 37,500 incarcerated

adults in Kentucky. *Id.* If states were countries, Kentucky would rank at least

seventh-highest in the world for its rate of incarceration, worse than all

countries outside of the United States. *Decade Since HB 463* at 1. There has

been a temporary drop in Kentucky's prison population due to Covid-19

commutations, but the upward trend continues. *Id.* at 2.

So why does Kentucky have such a high incarceration numbers relative

to other states? It is not because our citizens are less law abiding than in other

states. Part of that growth is due to the Kentucky General Assembly choosing

32

to pass legislation that "establishes new crimes and penalties, expands the parameters of existing crimes, enhances already harsh sentencing practices and lengths of incarceration, or otherwise increases punishment." *Id.* at 5. "[A] review of legislation enacted between 2011 and 2021 relating to felony criminal punishment found that just ten bills reduced criminalization and incarceration while 59 bills increased or enhanced criminal punishment in some way." *Id.* (citation footnote omitted). Additionally, our laws mandatorily impose far too lengthy sentences for repeated low-level crimes by providing enhancement after enhancement. Our Persistent Felony Offender (PFO) statutes are a prime example of this practice.

As noted in Robert G. Lawson's, *PFO Law Reform, A Crucial First Step Toward Sentencing Sanity in Kentucky*, 97 Ky. L.J. 1, 6–7 (2009), Kentucky's persistent felony offender law "clearly heads the list of tough-on-crime measures that have filled prisons and jails beyond capacity, pushed the state's corrections budget off the charts, and changed the balance of power over punishment in ways that threaten the basic fairness of the justice system." While things have changed around the margins, in the time since this article was published our PFO laws continue to sweep low level offenders into increasingly lengthy sentences.

> A repeat offender law that throws a blanket over all offenders with a felony record, as Kentucky's does, is destined to squander corrections resources by filling prison beds with many inmates who are more threatening to themselves than to others. And . . . it is destined to produce results that are totally at odds with core values of a justice system that is committed above all else to the belief that "all offenders should receive their particular deserts-no

33

more and no less."

*Id.* at 22–23.

Incarcerating felons in our state prisons is not cheap. The Department of Corrections expenditures for Fiscal year 2021-2022 was a total of more than $605 million.[4] *Annual Report 2021*, Kentucky Department of Corrections, 21, https://corrections.ky.gov/About/researchandstats/Documents/Annual%20Reports/2021%20Annual%20Report%20-%2011-2022.pdf. To put that in context, the similarly priced, $626 million DOC enacted budget from the General Fund for 2022 constituted "a 72% increase from [the DOC enacted budget in] 2010 in actual terms" while "[o]ver that same period of time, total General Fund expenditures have grown just 45%[.]" *Decade Since HB 463* at 5.

Kentucky's total state facility average cost comes in at $38,409.45 per inmate, with the costs varying substantially depending upon the facility, with a bed at the Kentucky State Penitentiary costing significantly higher at $65,378.02 per year.[5] *Cost to Incarcerate – FY22*, Kentucky Department of Corrections, https://corrections.ky.gov/About/researchandstats/Documents/Annual%20Reports/FY22%20CTI.pdf

---

[4] The total of $605,727,967.91 included the costs for corrections management, community services, adult institutions and a local jail allotment, with these categories including personnel, operating costs, care and support, debt service (for the construction of facilities) and capital outlays, with adult institutions constituting 59% of the total budget at more than $355 million.

[5] In contrast, a bed at the Lee Adjustment Center is the least, at $29,154.83 per year; county jails who house state inmates cost $18,288.94, those without state inmates cost $14,638.94, and halfway houses cost $17,040.14. In comparison, electronic monitoring only costs $2,413.46 per year and the cost to supervise through Probation and Parole is only $1,499.78 per year.

Kimmel's example provides a pertinent case study in just what is wrong with Kentucky's incarceration practices. Kimmel is a habitual shoplifter, who is a potentially undiagnosed kleptomaniac, and has a lengthy history of committing these types of low-level, non-violent crimes. In 2009, Lawson provided numerous examples of how low-level offenders were sentenced to disproportionate sentences based on the application of our PFO statutes in *PFO Law Reform* and, more than a decade later, Kimmel fits right in with those examples.

Kimmel shoplifted a $12.88 doll from Walmart and $142.68 worth of ammunition from Rural King. Each of these events constituted theft by unlawful taking. As the property taken was valued under $500, these were Class B misdemeanors. KRS 514.030(2). Class B misdemeanors are subject to a term of imprisonment that "shall not exceed ninety (90) days." KRS 532.090(2).

However, Kimmel was subject to a new crime and a longer sentence for each because he previously had been banned from the two stores where he shoplifted and, pursuant to KRS 511.090(2), no longer had a license to enter or remain in such premises which were generally open to the public. This made his conduct in entering such stores with intent to commit theft by unlawful taking constitute the crime of burglary in the third degree, a Class D felony. KRS 511.040. Class D felonies have a sentencing range of one to five years'. KRS 532.060(2).

Next, based on Kimmel's previous record, which included felony convictions for theft by unlawful taking for property of higher values, and burglary in the third degree (based on having been banned from other stores for shoplifting), and having committed a felony, Kimmel qualified as a persistent felony offender in the first degree (PFO-1) pursuant to KRS 532.080(3). As a PFO-1 convicted of either a Class C or Class D felony,[6] he was subject to a sentence of between ten and twenty years of incarceration. KRS 532.080(6)(b). The jury then determined Kimmel should serve the maximum term for each count as a PFO-1 through consecutive sentences and the circuit court decided to impose this sentence as specified, thinking that the Department of Corrections would correct this sentence as needing to be concurrent. On appeal, the Commonwealth asserted that Kimmel must serve each sentence consecutively based upon the most punitive reading of our sentencing laws possible.

While I agree that repeat offenses are appropriately subject to longer sentences as provided by our sentencing structure, I do not agree with the manner in which Kimmel has been subjected to enhancement after enhancement for shoplifting. Twenty-year sentences, whether served

---

[6] The General Assembly thus conflates two classes of crimes, Class C and Class D felonies, which originally have different sentencing ranges (five to ten years for Class C felonies and one to five years for Class D felonies as provided in KRS 532.060(2)(c) and (d)), into one PFO-1 sentencing range resulting in a ten-to-twenty-year sentencing range. This results in an increased minimum sentence for Class D felonies which is ten times greater than would be available without such an enhancement, or four times greater maximum sentence, as compared with only a doubling in the minimum and maximum sentences for Class C felonies.

36

concurrently or consecutively are clearly disproportionate to the crimes which he committed, with the shoplifting offenses themselves only subject to ninety-day maximums.

Incarcerating low level criminal felons with lengthy sentences does not make financial sense. Just as with low level drug users, there are other options that may place offenders on a more positive trajectory. I urge members of the General Assembly in the strongest terms possible to consider what reforms may be enacted to limit punitive sentences imposed on low level offenders.

While legislative reform is clearly needed, I need not solely depend on legislative reform for improvements in our situation. There are still things that can be done at the trial level to remove low level offenders from the path of continued recidivism and increasingly punitive sentences subject to lengthy mandatory minimums. I urge prosecutors, defense attorneys and my brother and sister judges who serve on our trial level courts to consider what they may do to help put low level offenders on a different path. Prosecutors, rather than seeking to "win" through the imposition of the lengthiest sentences possible whether through plea agreements or during the sentencing phase of a trial, should consider what sentences would be just given the nature of the underlying offense. Defense attorneys should advocate for alternatives which will realistically allow their clients to successfully address and reform their criminal behavior. Prosecutors and judges should consider whether probation with appropriate treatment is a valid option.

As Kimmel is a shoplifter, I address what can be done for shoplifters before they are classified as burglars and then PFOs for their shoplifting conduct. Shoplifting is a very common crime. Approximately one in eleven Americans shoplift and there are 550,000 shoplifting incidents per day in this country. National Association for Shoplifting Prevention (NASP), *The Shoplifting Problem*, https://www.shopliftingprevention.org/the-shoplifting-problem/ (last visited Apr. 6, 2023). Just as with drug addiction, "many individuals who shoplift experience a pleasurable rush of dopamine throughout the body, similar to other addictive behaviors, and seek to feel that pleasure again and again." Steven Petrow, Perspective, *Struggling with Mental Health, I Began to Shoplift*, The Washington Post, https://www.washingtonpost.com/wellness /2022/09/26/shoplifting-depression-mental-health/ (quoting interview with Adam Borland, psychologist at the Cleveland Clinic's Center for Behavioral Health).

Treatment options for shoplifting include cognitive behavioral talk therapy, the administration of psychotropic medications, participation in support groups, and twelve-step recovery programs. *Id.* There are also educational programs with very encouraging results in documented studies.

The NASP educational programs, the Shoplifters Alternative Course and the Youth Educational Shoplifting Program, which are typically assigned through the justice system as a condition of probation or alternative sentencing, are online programs that boast of a recidivism rate upon completion averaging 2.9% nationally compared to a 30-40% recidivism rate

38

among offenders who do not participate in such a program. NASP, *Criminal and Juvenile Justice*, https://www.shopliftingprevention.org/criminal-juvenile-justice/ (last visited Apr. 6, 2023). These programs cost $75 per offender and take approximately four hours to complete. Email from Renee Sirianni, Deputy Executive Director of the National Association for Shoplifting Prevention (March 28, 2023, 10:24am CST) (on file with author) (*Sirianni Email 1*). Court ordered participation in such programs potentially offers substantial savings to our Commonwealth if recidivism is thereby reduced but they are currently underutilized in our state.[7]

While I do not know if programs like this would help Kimmel, I do believe it is our duty to try to help offenders become productive citizens and this is one low-cost option that ought to be considered.

---

[7] These programs feature video scenarios and 124 questions designed to test their comprehension. Too many incorrect answers results in the participant having to restart the program and a certain level of comprehension must be obtained to pass the program. *Sirianni Email 1.* The programs also contain a Psychological Profile Analysis and Risk Assessment to help identify offenders at risk of repeating shoplifting offense who may need referral for additional services. *Id.* However, only a few of Kentucky's 120 counties have referred offenders to this program. Email from Renee Sirianni, Deputy Executive Director of the National Association for Shoplifting Prevention (March 31, 2023, 11:36 CST) (on file with author) (*Sirianni Email 2*). Sirianni reported that Jefferson, Paducah, Pulaski, Carter, Lexington-Fayette Marion, Mercer, Letcher, and Graves Counties have referred offenders to this program in conjunction with a retailer-initiated program. *Id.* The number of offenders in Kentucky to have gone through this program is relatively small at under 3,000, with this number including individuals managed by county court systems in other states who use the NASP programs for transfer and out of town cases as well as the United States Army in Fort Knox. *Id.* In comparison, the number of county-wide adoption of this program in other states ranges as high as 95% in New Jersey, 87% in Florida and 76% in Michigan. Email from Renee Sirianni (Apr. 3, 2023, 12:43pm CST) (on file with author) (*Sirianni Email 3*). Nationwide, NASP's programs have helped more than one million adults and juveniles to stop shoplifting, and "are appropriate for both first and repeat offenders and provide benefit to any offender who has not already completed this type of comprehensive education." *Sirianni Email 1.*

Accordingly, I concur with the majority opinion.

CONLEY, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with the Court's conclusion that there were no evidentiary errors as to the admittance of prior instances of shoplifting or the narration of Michael Knipp. Respectfully, however, I dissent as to its application of KRS 533.060(3) and KRS 532.110(1)(c). These two statutes present an actual, irreconcilable conflict, or, at the least, present an apparent conflict. Rules of statutory construction counsel that we apply KRS 533.060(3). Therefore, I would affirm the trial court's sentence of forty years total imprisonment for consecutive twenty-year sentences.

"Apparent conflicts or requgnancies [sic] between statutes on the same general subject enacted at different times should be reconciled in the light of the existing statutes and Constitution." *Brown v. Hoblitzell*, 307 S.W.2d 739, 744 (Ky. 1956). But "[i]f the conflict cannot be reconciled, the later statute controls." *Id.* Here, application of KRS 533.060(3) leads to a forty-year sentence. Application of KRS 532.110(1)(c) leads to a twenty-year sentence. This is a conflict. Typically, we would apply the statute passed latter in time, which in this case is KRS 532.110(1)(c). *Id.* Two other rules of statutory construction, however, are more compelling in this instance. First, the rule that the more specific statute controls over the general. *Abel v. Austin*, 411 S.W.3d 728, 738 (Ky. 2013). KRS 533.060(3) is undoubtedly more specific. Second, the rule that "[t]he Legislature is presumed to be aware of the existing law at the time of enactment of a later statute." *Stogner v. Commonwealth*, 35 S.W.3d 831,

40

835 (Ky. 2000). These two principles obviate any concern over the General Assembly's amendments of KRS 532.110 in 2002 and 2006, making it the statute passed later in time.

Briefly, I do not agree that our precedent interpreting KRS 533.060(2) is applicable here. *Peyton v. Commonwealth* ruled that under that provision's language "'the period of confinement for that felony shall not run concurrently **with any other sentence**,' should be construed as meaning [only] that subsequent felony offense(s) committed while on probation or parole may not be run concurrently with the sentence for which the individual is on probation or parole." 253 S.W.3d 504, 511 (Ky. 2008) (quoting KRS 533.060(2)) (emphasis added). *Blackburn v. Commonwealth* explicitly relied on that construction of "any other sentence" in *Peyton* to hold that KRS 533.060(2) did not control for multiple sentences received at the same time and ran consecutively by the trial court with one another, because "such an interpretation would 'take the phrase "with any other sentence" and extend it beyond the context and statutory framework where it is found.'" 394 S.W.3d 395, 400 (Ky. 2011) (quoting *Devore v. Commonwealth*, 662 S.W.2d 829, 831 (Ky. 1984) (Leibson, J., dissenting)).

But more to the point is that both *Peyton* and *Blackburn* are cases interpreting a different provision other than KRS 533.060(3) and were rendered two and five years after the last amendments to KRS 532.110, respectively. Thus, when the General Assembly passed those amendments, it was aware of previous judicial constructions that had been given to both KRS 532.110 and

41

533.060(3). Specifically, *Commonwealth v. Martin* had held that the latter statute controlled over the former. 777 S.W.2d 236, 238 (Ky. App. 1989). The Court has not cited this case in its opinion. Moreover, another appellate court case had previously held KRS 533.060(3) controlled over KRS 532.110(1)(a). *Handley v. Commonwealth*, 653 S.W.2d 165, 166 (Ky. App. 1983). And as the Court accurately states, this Court had already spoken on the issue of KRS 533.060(3) controlling over KRS 532.110(1)(c) in the event of a conflict in *White v. Commonwealth*, 5 S.W.3d 140, 142 (Ky. 1999), holding the former applies over the latter. Thus, by the time the General Assembly amended KRS 532.110 in 2002, it was presumably aware for thirteen years that the courts of the Commonwealth were applying KRS 533.060(3) over KRS 532.110(1)(c), despite the latter's statutory cap. "The failure of the legislature to change a known judicial interpretation of a statute is extremely persuasive evidence of the true legislative intent. There is a strong implication that the legislature agrees with a prior court interpretation of its statute when it does not amend the statute interpreted." *Bloyer v. Commonwealth*, 647 S.W.3d 219, 225 (Ky. 2020).

The amendment to KRS 532.110 in 2002 was not to subsection (1)(c) of that statute. Instead, it added language to subsection (2), making that section read: "If the court does not specify the manner in which a sentence imposed by it is to run, the sentence shall run concurrently with any other sentence which the defendant must serve **unless the sentence is required by subsection (3) of this section or KRS 533.060 to run consecutively.**" Act of Mar. 11, 2002, ch. 11, § 5, 2002 Ky. Acts 227, 228-29 (emphasis added). This addition post-

42

dates the language in KRS 532.110(1)(c) referring to KRS 532.080, and indicates legislative intent that KRS 533.060 is controlling. Thus, the General Assembly was well aware that KRS 533.060 creates exceptions to the general scheme created by KRS 532.110. Moreover, none of its amendments changed the known interpretation that KRS 533.060(3) was more specific and controlling over the statutory cap of KRS 532.110(1)(c). Thus, because Kimmel committed one offense while awaiting trial for another offense those two sentences cannot be run concurrently (which is the functional result of the Court's opinion), therefore the forty-year sentence is lawful, and I would affirm the trial court.

VanMeter, C.J.; Keller, J., join.

COUNSEL FOR APPELLANT:

Jennifer Leigh Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General